In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3856

RIVER EAST PLAZA, L.L.C., formerly known as
MCL CLYBOURN SQUARE SOUTH, L.L.C.,

*Plaintiff-Appellee,*

*v.*

THE VARIABLE ANNUITY LIFE INSURANCE COMPANY,

*Defendant-Third Party Plaintiff-Appellant,*

*v.*

DANIEL E. MCLEAN,

*Third Party Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 4354—**John W. Darrah**, *Judge.*

ARGUED APRIL 11, 2007—DECIDED AUGUST 22, 2007

Before CUDAHY, KANNE, and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.*   This diversity case involves
a loan used to finance a significant commercial real estate
development. When the borrower sold the property and
pre-paid the loan, it balked at paying a "prepayment fee"
according to the terms of the note. The borrower eventu-

ally paid the fee, subject to a reservation of rights, and sued the lender. After a bench trial, the district court entered judgment in favor of the borrower and the lender now appeals. For the reasons set forth below, we reverse the judgment of the district court and remand the case for further proceedings.

## I. HISTORY

River East Plaza, L.L.C. (River East) is a real estate developer.[1] Third party defendant Daniel E. McLean is the president of River East. River East had worked with another party to develop a large retail store on the north side of Chicago. In 1999, the other developer offered to sell its share of the project to River East for roughly $12 million. River East, through a mortgage broker, shopped around for a loan to allow it to buy out the other developer's share. Variable Annuity Life Insurance Company (VALIC) offered to meet River East's demand for a closing date before the end of the year and agreed to an interest rate that River East wanted. Among the other terms of VALIC's offer was a "yield maintenance" prepayment clause. A yield maintenance prepayment clause is an attempt to ensure that prepayment does not deprive the lender of the yield that they bargained for over the life of the loan.

The final version of the note contained a yield maintenance calculation which the parties describe as "Treasury-flat." To arrive at the amount of the yield maintenance fee in the event that River East decided to prepay, the

---

[1] Some of the actions described herein were performed by the parties' predecessors in interest or by subsidiaries of the parties. For clarity, we will uniformly refer to the parties by their current names as used in this appeal.

parties would need to know the outstanding principal as of the date of prepayment and the scheduled loan payments from that date to maturity. They would also need to determine the prevailing interest rate on United States Treasury bonds or notes maturing closest to the loan's maturity date of January 2020 ("Treasuries"). With those three amounts in hand, the clause calculates the difference between the scheduled payments and potential interest if the prepaid principal were invested in Treasuries. That amount is compared to an amount equal to one percent of the outstanding principal. The *larger* of these two numbers is then compared with the highest rate allowed by law, and the *lesser* of those two numbers is the yield maintenance fee. In short, the remaining interest due under the note is discounted by the current interest rate on Treasuries. The provision is described as Treasury-flat because parties can (and apparently occasionally do) negotiate a discount rate that is different from the Treasury yield.

Some examples are in order. If River East decided to exercise the privilege of prepayment and interest rates had fallen since the time that the loan was funded, River East would be on the hook to pay VALIC the difference between what VALIC *would have* received in interest over the life of the loan and what VALIC *could receive* by investing the prepaid principal into Treasuries. Assuming that VALIC placed the unexpected principal into Treasuries and received the prepayment fee from River East, the expected yield that VALIC bargained for would be "maintained" by River East supplementing the interest on the reinvested funds with the prepayment fee. If, however, River East prepaid the loan and interest rates had risen substantially in the interim, the interest on the Treasuries would presumably exceed the interest rate called for in the loan and the prepayment fee would equal the minimum fee of one percent of the outstanding principal. But in no

case would the fee exceed the maximum interest rate allowed by law.

The parties dickered over several of the terms in the note. River East sought to have the yield maintenance fee removed, but VALIC refused. Prior to closing, River East's counsel offered to both parties a seven-page opinion letter that, among many other opinions, "express[ed] no opinion as to the enforceability of any provision . . . providing for a prepayment premium in the event . . . such premium is held to be a penalty." Appellant's App. at 183F. Nevertheless, the parties went forward with the closing.

Several years later, River East sought to sell the property. The tenant had a right of first refusal, and offered to purchase the property. But the tenant would not assume the loan. River East eventually sold the property to the tenant and prepaid the loan.

The parties then began to dispute the size and enforceability of the prepayment penalty. River East eventually paid the penalty under protest, and brought suit in the state courts of Illinois. VALIC removed the case to the federal district court and counter-claimed against River East and McLean for costs and fees. The parties agree that, due to a mathematical error, VALIC's agent had overcharged River East by nearly one million dollars when it computed the prepayment fee. VALIC returned the overcharge, with interest, but the parties still dispute whether the amount returned was the correct amount. The district court conducted a bench trial, and entered judgment in favor of River East on the question of whether the prepayment fee was enforceable under Illinois law. The district court did not enter judgment on the question of whether VALIC had accurately returned the overcharge (that question being moot due to the court's first holding), and the court dismissed VALIC's cross-claim. This appeal followed.

## II. ANALYSIS

VALIC appeals the judgment entered after a bench trial. We review the district court's findings of fact for clear error and review legal conclusions *de novo. Trustmark Ins. Co. v. General & Cologne Life Re of America*, 424 F.3d 542, 551 (7th Cir. 2005). A federal court sitting in diversity applies the substantive law of the state in which the district resides. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). When the highest court in the state has spoken on a question of law, we apply that rule. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2005). When the highest court has not spoken, we attempt to predict how the highest court would hold. *Id.*

We have three questions before us on the appeal. First, whether the prepayment clause is enforceable under Illinois law. Second, if the clause is enforceable, whether the amount refunded by VALIC was the correct amount. Third, again only if the clause is enforceable, whether River East or McLean owes costs and fees to VALIC.

### A. Enforceability of the Prepayment Fee

Yield maintenance prepayment clauses are nothing new. *See Dale A. Whitman, Mortgage Prepayment Clauses: A Legal and Economic Analysis*, 40 UCLA L. REV. 851, 871 (1993). The idea behind a yield maintenance clause is to protect a lender during times when interest rates are falling. "Yield maintenance formulas are calculated to cover the lender's reinvestment loss when prepaid loans bear above-market rates." *George Lefcoe, Yield Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Prepayment,* 28 REAL EST. L.J. 202, 202 (2000). A lender who makes a long-term loan expecting a particular rate of interest runs the risk that prepayment during a period of lower interest rates will reduce its income.

VALIC argues that some lenders, itself included, need to be able to rely on predictable payments in order to live up to their other financial and regulatory obligations. When the loans in question are measured in eight digit figures, as in this case, the lost interest income can be substantial.

One method that lenders might use to guard against this risk is to refuse to allow borrowers to prepay the loan. *See* RESTATEMENT (THIRD) PROP. (MORTGAGES) § 6.2 (1997) ("an agreement that prohibits payment of the mortgage obligation prior to maturity is enforceable"). Or lenders might charge a fixed fee, a percentage of the loan balance, or a declining percentage of the loan balance. *Whitman*, 40 UCLA L. REV. at 871. However, assuming that the borrower would like the privilege of prepaying the loan instead of being locked in for its entire term, fees based on fixed numbers or the loan balance do not take into account long-term fluctuations in interest rates. Hence the development of yield maintenance clauses: formulas that attempt to account for the expected interest, the outstanding principal, and fluctuations in prevailing interest rates.

We should note at the outset that the parties are unable to agree on the legal standard that Illinois courts would apply to this question. River East maintains that Illinois would analyze the prepayment fee under a liquidated damages analysis. Appellee's Br. at 17-31. VALIC argues that Illinois would consider the clause to be a bargained-for form of alternative performance. Appellant's Br. at 16-19. The district court applied Illinois's liquidated damages analysis but did not cite any Illinois cases to support that decision. *River East Plaza, L.L.C. v. Variable Annuity Life Co.*, No. 03 C 4354, 2006 WL 2787483 at *8-9 (N.D.Ill. Sep. 22, 2006).

The parties can point us to no case from the Illinois Supreme Court that establishes a rule of law for the

enforceability of prepayment fees in commercial real estate loans, and we are unable to find one. Illinois has placed statutory limitations on the ability of lenders to charge prepayment fees, but those provisions apply only to certain residential mortgages. *See* 815 ILL. COMP. STAT. 205/4. River East argues that "the Illinois Supreme Court has adopted the Restatement of Contract's prohibition against penalty clauses." Appellee's Br. at 19 (citing *Bauer v. Sawyer*, 134 N.E.2d 329, 333 (1956)). VALIC appears not to take issue with this statement of the law. But we should note that *Bauer* was not a case concerning mortgage prepayment, and it specifically cited to Section 356(1) of the Restatement, which stands more precisely for the proposition that some liquidated damages clauses are void as against public policy because they are penalties. RESTATEMENT (SECOND) OF CONTRACTS § 356(1) ("A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty."). The comments to the Restatement clarify: "Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy." REST. 2D CONTR. § 356(1) cmt. a.

If we start from the position that Illinois will not enforce penalty clauses, and that Illinois recognizes that some liquidated damages clauses cross the line and become penalty clauses in disguise, the underlying question is whether this clause is punitive in nature. "[W]hen the sole purpose of the clause is to secure performance of the contract, the provision is an unenforceable penalty." *Checkers Eight Ltd. P'ship v. Hawkins,* 241 F.3d 558, 562 (7th Cir. 2001) (citing *Am. Nat'l Bank & Trust Co. of Chi. v. Reg'l Transp. Auth.,* 125 F.3d 420, 440 (7th Cir. 1997); *Med+Plus Neck & Back Pain Ctr., S.C. v. Noffsinger*, 726 N.E.2d 687, 693 (Ill. App. Ct. 2000)). Penalties, or liquidated damages clauses in general, are distinct from

alternative forms of performing the obligations under the contract. *See* JOHN D. CALAMARI & JOSEPH M. PERILLO, CONTRACTS § 14-34 (3d ed. 1997). In order to distinguish between the two, "a court will look to the substance of the agreement to determine whether . . . the parties have attempted to disguise a provision for a penalty that is unenforceable. . . . In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive." RESTATEMENT SECOND OF CONTRACTS § 356 cmt c.

Using the Restatement as a guide, we will first consider the "relative value of the alternatives" to see if they are decisive. All of the figures that follow (although rounded for ease of reading) come from the stipulated facts dated February 14, 2005 that the parties agreed on, and which the district court adopted. River East borrowed $12.7 million from VALIC at 8.02% interest. If River East had paid as scheduled over the course of twenty years, it would have paid roughly $16.4 million in interest to VALIC before the note matured in 2020. By July 2003, when River East prepaid the loan subject to reservation of rights, the outstanding principal remained over $12 million, and River East had already paid roughly $3.45 million in interest. On July 1, 2003, River East paid slightly more than $4.7 million in prepayment fees, but that sum was reduced to approximately $3.9 million while this litigation was pending when VALIC reimbursed the overcharge.

Looking at the relative value of the alternatives, we are not convinced that the parties used this clause to disguise a penalty that is unenforceable. By electing an option to pay early, River East avoided paying the $13 million in remaining interest payments that would have been due between 2003 and 2020, and instead paid only $3.9 million. Even assuming, due to the time value of money, that the $3.9 million was worth more in 2003 than it would have been worth over the course of the loan, River East seems

to have benefitted from this bargain. This hardly seems to be a clause whose "sole purpose is to secure performance of the contract." *Checkers Eight,* 241 F.3d at 562. Note, for example, that this prepaid interest is automatically reduced by the operation of the discount rate in the prepayment clause: River East was not obligated to pay any of the forgone interest that VALIC could have earned back by investing the returned principal in Treasuries.

But what of the "relative value of the alternatives" to VALIC? River East makes much of the fact that VALIC was "overcompensated" by the prepayment clause. Appellee's Br. at 1, *et seq*. Of course, a value-laden term such as "overcompensated" only begs the question of "compared to what?" It certainly cannot be the case that VALIC was overcompensated by receiving more from River East than it contracted for. It contracted to receive $16.4 million over twenty years. Loan amortization being what it is, that income from interest would have been front-loaded into the first half of the loan term. Instead, VALIC received $3.45 million over three years and an additional $3.9 million in year four. River East also does not make the argument that the prepayment overcompensated VALIC compared to what the prepayment clause required. We recognize that there is a second question at play here, regarding whether VALIC's agent properly calculated the payoff amount, which was the subject of count two of the complaint. More on that later. But whether VALIC's agent incorrectly calculated the figure in 2003 cannot be the grounds for arguing that the clause was unenforceable as written in December 1999.

Instead, River East relies on a clever argument that VALIC is overcompensated because VALIC can now, if it so chooses, reinvest the returned principal and eventually get an even greater income stream from somebody else than it would have received from River East. This argument is worth considering in more detail. The prepayment

provision is termed "Treasury-flat." This means that VALIC's 8.02% interest rate was discounted by the prevailing rate on Treasuries as of the date that River East elected to prepay. As we noted above, the unwritten assumption in such a formula is that VALIC can take the returned principal, invest it in Treasuries, and by taking the income from the Treasuries and adding it to the prepayment fee, VALIC gets the exact return it expected from the loan. Reality, we might suspect, will be different. One might believe, and expert testimony at trial supported this belief, that interest rates on commercial real estate loans will almost always exceed the interest rates on Treasuries. This spread in interest rates gives VALIC a chance to profit from the prepayment. The argument goes that sophisticated lenders like VALIC will not invest the returned principal in Treasuries, but will simply line up a new commercial real estate loan. But there is an irony to this argument. In trying to argue that the prepayment clause is a penalty, which by definition is a clause whose sole purpose is to secure the performance of the contract, River East argues that VALIC would have been effectively *worse* off if the contract had been repaid over the term of the loan instead of prepaid.

In short, viewing the contract in light of Illinois's reliance on the Restatement, we find nothing to suggest that the clause is an unenforceable penalty. Under Illinois law, the loan could have explicitly prohibited any prepayment whatsoever. River East desired the option to prepay. VALIC accommodated that desire and included a Treasury-flat yield maintenance prepayment fee. River East voluntarily prepaid, and by doing so River East escaped paying $13 million in interest over seventeen years by prepaying $3.8 million in 2003. VALIC received its principal, and was free to either reinvest it in Treasuries (in which case it would be no worse off), hold it as cash (in which case its income would be less than bargained for

from River East), or invest it in additional real estate mortgages with their attendant higher risks of default. The relative value of the alternatives for both parties leads us to believe that the clause is not punitive in nature.

River East and the district court believe that Illinois courts would apply the rubric of liquidated damages to determine if the prepayment clause is unreasonable. As River East notes in its brief, Illinois follows the Restatement in holding that "[d]amages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss." RESTATEMENT SECOND OF CONTRACTS § 356; *see also Bauer*, 134 N.E.2d at 333. Certainly under any ordinary view of the contract's unambiguous terms, the prepayment is not a breach: the parties explicitly provided that River East would be allowed to prepay. The fee for prepaying seems a long stretch from damages for a breach if both parties entered the contract believing that the contract allowed River East to prepay.

Nevertheless, it is conceivable that a state might use the law of liquidated damages as some sort of analogy to determine whether the prepayment clause is a penalty as opposed to alternative performance. As we noted above, we find nothing in decisions of Illinois courts to indicate that this is the case in Illinois. The Illinois cases that the parties have drawn to our attention are silent on the question.

The only case that uses the term is clearly off-topic. In *Goodyear Shoe Mach. Co. v. Selz, Schwab & Co.*, 51 Ill. App. 390 (Ill. App. Ct. 1894), the court applied a liquidated damages analysis to a prepayment discount for early payment of amounts owed under a royalty agreement. Holding that a fifty percent discount for paying a bill two weeks early was only a device to disguise a late payment

fee of one hundred percent, the court examined the reasonableness of a one hundred percent late payment fee under a liquidated damages analysis. This seems awfully flimsy precedent to support the argument that "prepayment provisions are analyzed as liquidated damages clauses." Appellee's Br. at 22.

Even the law review article that River East cites to support its argument contradicts River East's position. Appellee's Br. at 20 (citing 40 UCLA L. REV. 851, 889-90). In surveying the legal landscape of how state courts confront prepayment clauses, Professor Whitman observes that "state courts have ignored the law of liquidated damages (perhaps appropriately) when faced with the issue of the validity of prepayment fee clauses." 40 UCLA L. REV. at 889. Professor Whitman continues: "a freely-bargained prepayment fee clause ought to be enforced against the borrower who makes a voluntary prepayment, irrespective of the amount of money that the lender's clause demands." *Id.* at 890. After concluding that such clauses likely are, in a theoretical sense, liquidation of damages, Professor Whitman concludes that the "confusing pastiche" of liquidated damages laws should be ignored by courts, a result that is "consistent with nearly all of the nonbankruptcy cases involving voluntary prepayments." *Id.*

Nevertheless, the district court relied on a federal case, *Automotive Fin. Corp. v. Ridge Chrysler Plymouth, LLC*, 219 F. Supp. 2d 945 (N.D. Ill. 2002), for the proposition that Illinois would have considered the case under a liquidated damages framework. *Automotive Finance* makes no such conclusion. The court in *Automotive Finance* emphasized, as we did above, that the real question is whether the clause is a penalty intended to secure performance. *Id.* at 949 ("[T]he real question is not whether [the clause] sets out damages for a breach, but rather whether that paragraph calls for payment of an unenforceable

penalty."). The court was careful to note that it was invoking a "comparison" to the law of liquidated damages, and called cases comparing liquidated damages to penalties "an apt analogy." *Id.* at 949-50.

The court in *Automotive Finance* cited to this court's precedent of *In re LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir. 1984). We should observe that *LHD Realty* seems particularly off-topic here for three reasons: it was a bankruptcy case, the lender accelerated the note instead of the borrower voluntarily prepaying, and the court never purported to be relying on Illinois law. *Id.* But even if an Indiana bankruptcy case should be found persuasive for an Illinois voluntary prepayment, we observe that our holding in *In re LHD Realty* that "reasonable prepayment penalties are enforceable" was modified by the district court in *Automotive Finance* to read "*only* reasonable prepayment penalties are enforceable." 219 F. Supp. 2d at 949 (citing *In re LHD Realty*, 726 F.2d at 330) (emphasis added).

River East considers the clause unreasonable because the lender will almost always be able to re-lend the principal at a rate higher than the Treasury rate, because commercial real estate loans frequently carry a rate higher than the treasury rate. River East notes that many players in the industry have adjusted their prepayment clauses to account for some of that cushion between the Treasury rate and the loan's rate by adding twenty-five or more basis points to the discount rate. But this only shows that lenders and borrowers are involved in a market where the relative risk of "breach" (if we were to make an analogy to damages) is weighed against the potential fluctuations of interest rates, regulatory pressures faced by insurers like VALIC, long-term risk of depressed real estate markets, availability of suitable replacement property owners, and any of a myriad other factors. But even the lenders who are most generous, by

adding twenty-five or fifty basis points to the Treasuries, would have made an "unreasonable" fee according to River East's argument because the fee would allow them to recover more from their future investments than they would have from the original borrower.

River East includes a make-weight argument that the parties never intended to agree to the clause. This claim should never have been allowed to proceed to trial. "The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law." *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991). Even if the parol evidence were allowed and credited, it falls far short of establishing that the parties did not intend to be bound by the prepayment clause. An opinion letter from a party's lawyer, which itself "expresses no opinion" on the enforceability of a term, is a poor excuse for evidence that the party did not intend to be bound. This is particularly true in light of the fact that the parties went forward with the closing despite the opinion letter. The fact that a party would have preferred a different term does not make a clause in the contract unilaterally voidable at a later date.

In short, we hold that VALIC is entitled to judgment as a matter of law on River East's first count of the complaint. We are convinced that a contrary result would have broad implications for both lenders and borrowers of mortgage-secured loans in Illinois, and might inadvertently effect a wide-ranging alteration of the law of real estate financing in Illinois. "The responsibility for making innovations in the common law of Illinois rests with the courts of Illinois, and not with the federal courts in Illinois." *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1289 (7th Cir. 1985). Accordingly, we must reverse the judgment of the district court with respect to count one of River East's complaint.

*B. The Overcharge Dispute*

When River East gave final notice that it intended to prepay the loan, VALIC's agent prepared a payoff statement that included the prepayment fee. Unfortunately, that agent miscalculated the fee by nearly one million dollars. This fact did not come to light until discovery, at which point River East amended its complaint to add a second count for breach of contract for the overcharge. The parties are unable to agree on the exact date that River East gave notice. It turns out that this question of fact carries a price tag of nearly $1600. The parties stipulated that if River East gave notice on April 21, then VALIC overcharged by $828,514.00, but if River East gave notice on April 22, then VALIC only overcharged by $826,922.27. VALIC returned $826,922.27 plus interest while this litigation was pending.

The district court held that River East's second count was moot because VALIC was required to repay the entire prepayment fee. Having found above that VALIC was entitled to keep the prepayment fee, the question is relevant again. This factual dispute was submitted to the district court for determination at trial. The district court appears to have made a finding of fact that the notice was received on April 21. *River East Plaza, L.L.C. v. Variable Annuity Life Co.*, No. 03 C 4354, 2006 WL 2787483, at *13 (N.D. Ill. Sep. 22, 2006) ("Based on the facsimile produced at trial, River East provided notice of its intent to prepay the Loan on April 21, 2003.").

But the math is perplexing. If River East originally paid $4,713,601.27, and VALIC returned $826,922.27, then River East had paid a total of $3,886,679.00. The district court had awarded VALIC an alternate prepayment fee of $123,012.15. Subtracting the alternate fee of $123,012.15 from the amount paid of $3,886,679.00 would leave $3,763,666.85 to be refunded to River East. But the district

court concluded that River East was entitled to a refund of $3,762,666.85. We are unsure of where that extra thousand dollars went. Perhaps we misread the district court's findings of fact regarding the date of notice, or perhaps we misread the district court's math. But if, as we suspect, the district court has found that notice was received on April 21, the exact amount of River East's refund should be clarified on the remand.

## C. *VALIC's Counter-Claims and Third-Party Claim*

The loan documents provided that if River East sued VALIC under the note and did not prevail, then River East would owe VALIC costs and fees, to include attorney's fees. VALIC's cross-claim against River East, and third party complaint against McLean as the guarantor of River East's obligations, was based on those terms. The district court denied VALIC's claim because River East did prevail. Of course, the legal landscape has now changed. River East has not prevailed on its first count, but as we noted above we are uncertain whether River East did or should prevail on the second count. The district court is entitled to make that determination in the first instance, and it will be among the issues considered on remand.

## III. CONCLUSION

For the reasons set forth above, the judgment of the district court is REVERSED and the case is REMANDED with instructions to enter judgment in favor of the appellant on count one of the complaint, and for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*